UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| * | |
| MIDWEST AG ENTERPRISES, INC., a * | CIV 08-4091 |
| Minnesota Corporation, MIDWEST AG * | |
| EXPORTS, INC., a Minnesota Corporation, * | |
| and JIM MOLINE * | MEMORANDUM OPINION |
| * | AND ORDER |
| * | |
| Plaintiffs, * | |
| vs. * | |
| * | |
| POET INVESTMENTS, INC., f/k/a., Broin * | |
| Enterprises, Inc., a South Dakota * | |
| Corporation, and POET NUTRITION, INC.,* | |
| f/k/a Dakota Gold Marketing, Inc., a South * | |
| Dakota Corporation, * | |
| * | |
| Defendants. * | |
| * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In their Amended Complaint, Plaintiffs, Midwest Ag Enterprises, Midwest Ag Exports, and Jim Moline allege that Defendants, Poet Investments, Inc., f/k/a Broin Enterprises, Inc. d/b/a Dakota Gold Marketing and Poet Nutrition, Inc., f/k/a Dakota Gold Marketing, Inc. breached the Marketing Agreement entered into between the parties as well as certain contracts for the shipment of DDGs. Plaintiffs also allege the following claims: (1) breach of the covenant of good faith and fair dealing; (2) fraud and deceit; (3) tortious interference with business expectancies; (4) defamation; and (5) punitive damages. Plaintiffs have since withdrawn their claim alleging defamation.

Defendants have filed a motion for summary judgment in which they argue that they are entitled to summary judgment on all of Plaintiffs' claims, or in the alternative, are entitled to partial summary judgment on some of Plaintiffs' claims. Defendants also move for judgment on the pleadings as to Plaintiffs' claims for fraud and deceit and punitive damages. Defendants argue that Plaintiffs have failed to plead these claims with the requisite particularity in violation of Federal

Rules of Civil Procedure 9(b).

The summary judgment motion has been fully briefed and the parties have filed additional briefs relating to Plaintiffs' claim for punitive damages. A motion hearing was held before the Court on May 10, 2010. For the reasons set forth below, Defendants' Motion for Summary Judgment is granted in part and denied in part and Plaintiffs' Motion for Judgment on the Pleadings is denied.

## BACKGROUND AND RELATED FACTS

The facts will be stated in the light most favorable to the Plaintiffs, the non-moving party in this summary judgment motion.

### Relationship Between Midwest Ag Enterprises and Broin Enterprises Prior to Written Marketing Agreement

Prior to 2007, Broin Enterprises, Inc., d/b/a Dakota Gold Marketing (hereafter referred to as "Dakota Gold Marketing n/k/a Poet Nutrition"), sold Dakota Gold dried distillers grains ("DDGs"), which is the feed co-product produced from the ethanol manufacturing process. DDGs generically references dried distillers grains. In the mid-1990's, Dakota Gold Marketing began branding DDGs that met certain specifications in terms of protein, fat, moisture, and color as "Dakota Gold." DDGs that do not meet the required specifications are marketed as generic dried distillers grains.

The problem that Dakota Gold Marketing was encountering was how to preserve the identity of their premium brand Dakota Gold products. Henry Bender of Dakota Gold Marketing testified in his deposition that as long as Dakota Gold Marketing was selling to an end user, they could ensure that the product was Dakota Gold. If, however, the product was sold to a resale company, Dakota Gold Marketing did not have any control over the integrity of its product. The DDG business is a commodity business and traders and resellers were not interested in brand name products, but rather purchased product from several different sources to supply a contract. This method of operation allowed them to arbitrage their positions. As a result, Dakota Gold products sold on the open market were often resold numerous times and mixed with DDGs produced by other companies before

2

reaching the final end user.

In 2003, Dakota Gold Marketing n/k/a Poet Nutrition began to work with Midwest Ag Enterprises to export Dakota Gold products into the Pacific Rim. Jim Moline ("Moline"), president of Midwest Ag Enterprises and Midwest Ag Exports had a knowledge of the Asian market and contacts with feed companies in that market. In return, Moline sought represent a brand name because it commanded a premium price and allowed him to sell a product that had a greater consistency in quality.

In early 2004, Midwest Ag Enterprises formed Midwest Ag Exports, a separate corporation to handle the export side of the business while Midwest Ag Enterprises continued to focus on the liquid feed side of the business. The officers of both companies are Jim Moline and John Pollack, but Moline works primarily on the export side while John Pollack works primarily on the liquid feed side of the business. Midwest Ag Enterprises and Midwest Ag Exports are both subchapter S corporations. The shareholders for both companies are Jim Moline, John Pollack, and the Reed Ethington Testamentary Trust.

Export business is conducted in the name of Midwest Ag Enterprises, but Midwest Ag Exports pays for all the purchases and sales of DDGs for export and thus all the profits and losses from the export business are reported on the financial statements of Midwest Ag Exports. Midwest Ag Exports pays Midwest Ag Enterprises a management fee for salaries and office space.

The first shipments of Dakota Gold products to Midwest Ag Enterprises were by railcars to the West Coast, but Midwest Ag Enterprises incurred difficulties unloading the railcars. Then Moline worked with L.G. Everest and established a transload spot in Kansas City, Missouri. On August 11, 2004, Moline forwarded to Jim Hansen, COO of Broin Enterprises, a letter of agreement between KC Transload in Kansas City and LG Everist. Moline indicated in the email that start-up of operations was August 25 and "[a]s mentioned in the letter of agreement, [Kansas City] Transload will need to provide LG Everist written contracts or supplier agreements and financial

3

data" and that "[i]t will be [Midwest Ag Enterprises's] responsibility to supply these documents to them." Moline stated that "I will need from Dakota Gold Marketing an agreement between [Midwest Ag Enterprises] and [Dakota Gold Marketing] to insure LG Everist of our relationship and increase their comfort level. I would hope to have this to them by Friday of this week." On August 26, 2004, Moline emailed Hansen again requesting an agreement between Midwest Ag Enterprises and Dakota Gold Marketing, stating that "[w]ith the amount of risk, capital, and commitments needed to make this all work, I think both of their comfort levels would be enhanced with this taken care of and out of the way." Hansen did not respond to Moline's request for a written agreement until August 30, 2004, at which time he stated that he and his staff planned to discuss such an agreement that day.

Moline began shipping Dakota Gold products through Kansas City Transload despite not having a written agreement in place with Dakota Gold Marketing n/k/a Poet Nutrition. Moline continued to pursue an written agreement with Dakota Gold Marketing n/k/a/ Poet Nutrition in order to protect the investment that Midwest Ag Enterprises was making in establishing contacts and promoting Dakota Gold products in the Pacific Rim. In an email on October 8, 2004, Moline wrote to Henry Bender of Dakota Gold Marketing that "I have written a couple of e-mails to Jim [Hansen] the last few weeks and have not received any response. I guess I am not totally sure where things stand and I was hoping you could fill me in? I can understand the issue with exclusivity and maybe we can figure another way to get the market protection we need. I just don't want to get blindsided and I surely want my people to feel comfortable with what we are doing in promoting Dakota Gold. . . ." The problem that Moline understood Dakota Gold Marketing to have with giving Midwest Ag Enterprises exclusive rights to distribute products in the Pacific Rim at that time had to do with the fact that Dakota Gold Marketing wanted to understand the marketplace more before partnering with anyone.

Early on, Hansen was seeking to partner with another company, Penny Newman Grain, as well as Midwest Ag Enterprises and wanted Penny Newman to be able to load containers of Dakota Gold HP products at the Kansas City Transload site. Moline was opposed to such an arrangement

4

because it could present direct competition to him with his customers in the Pacific Rim with the same product. Hansen sent an email to Penny Newman on March 31, 2005, in which he indicated that he would be meeting directly with Rob Everist from LG Everist and that he told Mr. Everist that he did not like what was going on in Kansas City and that they were thinking about pulling Dakota Gold out of their facility. Mr. Everist responded that he was not comfortable with its current "partner" and would much rather have Dakota Gold Marketing involved. On April 4, 2005, Hansen sent an email directly to Rob Everist at LG Everist in which he states "[i]t appears that Jim Moline, unless given an exclusive arrangement with us, will not allow us to use the facility in Kansas City. We have no intentions of giving Jim what he wants so my next question is can you transload for Broin and Dakota Gold Marketing at another location on your site?" As a follow up email on that day, Hansen stated in an email to Penny Newman "[a]re you game to do your own thing if push comes to shove and Jim Moline doesn't let us load cans out of his place? I talked with LG Everist and they have enough land on site that I think I could cut a deal and do our own thing."

In addition to its discussions with Penny Newman regarding export of Dakota Gold products, Hansen was informed on April 21, 2005, via email that Scoular IPC was really close to buying Dakota Gold HP product for container export.

In July 2005, Hansen and Moline traveled together to Malaysia to meet with Midwest Ag Enterprises' sales agents and customers. During the trip, various customers indicated that they could purchase Dakota Gold from suppliers other than Midwest Ag Enterprises and questioned why they should buy product from Midwest Ag Enterprises. On the trip, Hansen acknowledged that other suppliers could purchase product from Dakota Gold Marketing n/k/a Poet Nutrition and ship the product to the Pacific Rim, but that Dakota Gold Marketing could certify the product as Dakota Gold only if it was purchased through Midwest Ag Enterprises and its agents. On August 1, 2005, following the trip, Broin Enterprises issued a statement to its customers and traders in the Pacific Rim in which it stated:

. . . .

5

In the past 120 days it has been brought to my attention by our end-use customers that there have been trading companies, merchandisers and market participants who have been miss-representing our product.

. . . .

Effective October 1, 2005, we have told our customers that we can only guarantee product that is purchased through Delst, Asia for the South East Asia markets and through Ginmax for the Taiwan market is "Dakota Gold."[1] We will continue to sell our products to merchandisers, traders and other market participants in this market but we have no control over how many times the product is traded before it gets to the customer or in what form it might take, therefore we cannot guarantee that the product is Dakota Gold. That responsibility remains with the seller.

In his deposition, Henry Bender testified that even after this message was sent, Dakota Gold Marketing continued to sell and guarantee product as Dakota Gold product to other customers for sale in the Pacific Rim. Prior to the parties' execution of the marketing agreement, it seems that Moline was aware of at least one sale by Broin Enterprises of 500 tons of Dakota Gold to InternationalFeed.com. On September 8, 2005, Moline indicated that a customer told him of the shipment and Moline stated that "[o]thers traders are continuously making claims (and in fact truly delivering the said Dakota's products) to our existing customers that they can still sell Dakota Gold products (despite personal assurances from Dakota Gold Marketing that DelstAsia is the authorized distributor within the region.)" Hansen responded to Moline via email on September 8, 2005 stating that "[o]ne of our traders sold 500 tons to International, not IPC. IPC-Scoular does not have any product bought from us nor will they or anyone else for export from this point forward. A mistake was make and it has been addressed." Hansen stated further:

Let me restate our position once again so that we all have a clear understanding of what it is.

If you recall, while I was with you in Malaysia I stated to our/your customers that the only way that I could guarantee that they were buying Dakota Gold product was if they purchased it through Delst Asia. I also stated that we sell our products

_____

[1] Both Delst. Asia and Ginmax are agents that Midwest Ag Enterprises works with to distribute DDGs in the Territory.

to a wide variety of traders and customers but once it leaves our hands we have no way to guarantee that the product they are selling is Dakota Gold as it may have changed hands many times. Therefore, if they wanted to insure that they were buying Dakota Gold the only way to do that was if they purchased it through Delst Asia and Midwest Ag [Enterprises].

Henry Bender testified in his deposition that at this time, Dakota Gold Marketing was also selling Pro Corn out of its Preston facility to InternationalFeed.com because Moline did not want to purchase Pro Corn. Henry Bender stated further that Moline knew of such transactions, although the emails in the record that confirm Moline's knowledge were sent after the parties executed the Marketing Agreement.

**Marketing Agreement**

On November 22, 2005, Hansen and others from Dakota Gold Marketing n/k/a Poet Nutrition met with Moline and John Pollack from Midwest Ag Enterprises and John Drown, former President and CEO of The Schwan Food Company who attended the meeting at the request of Moline, to discuss the scope of a written marketing agreement between Midwest Ag Enterprises and Dakota Gold Marketing. After the meeting, Moline forwarded a list of key points to be incorporated into the Marketing Agreement which included that Dakota Gold Marketing appoints Midwest Ag Enterprises as the proprietary distributor of Dakota Gold products in the Pacific Rim. Hansen incorporated many of the points proposed by Moline into a draft marketing agreement including the point appointing Midwest Ag Enterprises as the "proprietary" distributor of Dakota Gold products. Hansen then sent the draft agreement to others within his organization, including its legal department, for review and comment on December 29, 2005. On December 30, 2005, Mike Salonen emailed Hansen regarding the draft agreement, asking "[d]o we have the ability to sell Dakota Gold to other customers that will ship into these same areas. If we do should his be addressed in the contract?" Hansen replied to Mike Salonen that "Yes we do; that's been clear all along and I don't believe it needs to be placed here because, if you note, we don't say anywhere in the agreement that [Midwest Ag Enterprises] as [sic] exclusive rights to market our product; but we do have language that say they can't market anyone elses. I think we have it pretty well-defined."

7

Midwest Ag Enterprises and Broin Enterprises, d/b/a Dakota Gold Marketing, executed the marketing agreement, effective January 1, 2006. The Agreement provides:

> a. Dakota Gold Marketing (DGM) appoints Midwest Ag Enterprises (MAE) as the proprietary customer/representative/distributor of Dakota Gold Products in the Pacific Rim/S.E. Asia and Japan.
> . . . .
> c. All leads and inquiries for Dakota Gold products that DGM receives for the territory included in this agreement will be forwarded to MAE for follow-up and sales.
> d. Exclusive Rights. DGM will be MAE's sole supplier of ethanol co-products.

The Marketing Agreement stated that its term runs from January 1, 2006 through December 31, 2007, "with automatic renewal (Evergreen) unless either party terminates this agreement with a 6 month written notice." Additionally, the Agreement provides that Midwest Ag Enterprises and Dakota Gold Marketing are to finish out contracts that would be in effect beyond the six month period. The Court will hereafter referred to the countries covered under the Marketing Agreement as the "Territory."

### Change in Corporate Structure by Broin Enterprises n/k/a Poet Investments and Dakota Gold Marketing n/k/a Poet Nutrition

On December 8, 2006, Dakota Gold Marketing, Inc. was formed as a subsidiary corporation of Broin Enterprises. Pursuant to a Contribution Agreement dated January 1, 2007, Broin Enterprises transferred to Dakota Gold Marketing, Inc., 22 DDGs marketing agreements that it had with various ethanol plants, the accounts receivable and accounts payable, and some cash in exchange for all of the shares of Dakota Gold Marketing, Inc. The Marketing Agreement between Broin Enterprises and Midwest Ag Enterprises for the sales of Dakota Gold products into the Territory remained with Broin Enterprises. Top management and personnel transferred from Broin Enterprises to Dakota Gold Marketing, Inc. which continued to operate the DDG business in a similar fashion. Broin Enterprises ceased selling DDGs and no personnel were thereafter employed with Broin Enterprises. Broin Enterprises is an investment holding company that owns one hundred percent ownership interest in Dakota Gold Marketing, Inc., a one hundred percent ownership interest

in Ethanol Products, LLC, and a minority ownership interest in three ethanol plants in Minnesota.

On March 30, 2007, Broin Enterprises changed its name to Poet Investments, Inc. and Dakota Gold Marketing, Inc. changed its name to Poet Nutrition, Inc. The operations and business structure of both companies continued more or less the same as before the name changes. The Board of Directors of Poet Investments remained as Jeff Broin, Daniel Loveland, Jeff Lautt, Bob Casper, and Craig Ludtke and its shareholders remained as Poet LLC. Poet Nutrition continued to share the same shareholders as Poet Investments and is entirely owned by Poet Investments.

**Defendants' Potential Dealings with Others in Pacific Rim After Marketing Agreement Executed**

On January 17, 2006, about two weeks after the Marketing Agreement was signed, Henry Bender sent an email to Hansen stating "I have not been offering HP to [Penny Newman], basically I think we want [Midwest Ag Enterprises] and International Feed.com to be our main faces in SE Asia for Dakota Gold and Dakota Gold HP." On January 30, 2006, Hansen sent an email to Bunge, another potential partner, stating that "I indicated to Danny that in the Pacific Rim we'd probably need to have someone in addition to Midwest Ag [Enterprises] represent Dakota Gold based on credit limits that Midwest Ag's company is hitting against. We discussed a possible trip to Singapore so that I could gain a greater understanding of your operations and the potential that Bunge holds for distribution in the area." On April 24, 2006, Henry Bender sent an email to Hansen which contained notes for an internal strategy meeting in which he stated:

c. Pac Rim
   i. Latest offer was $84 to Scoular

On June 7, 2006, Jim Moline sent an email to Jim Hansen stating:

I am not sure if you are aware of this, but Scoular/IPC has recently been pushing some Dakota Gold product into S.E. Asia. It has recently cost [Midwest Ag Enterprises] some sales and is again creating havoc and uncertainty in the

9

marketplace. If you are aware of this, what are the intentions of [Dakota Gold Marketing]? If you are not aware of this can you follow-up on this issue for me? I am also aware of the fact that some BPX has been substituted for Preston product which is destined for S.E. Asia.

Henry Bender indicated in an email to Hansen on June 8, 2006, that "Yes, Dakota Gold Marketing has been selling Dakota Gold to Scoular IPC–they have been buying Pro Corn at or above current market values on our price sheet. . . . We have always had an offer to Jim Moline out of [Pro Corn] at values equal to, or at times, even lower than what we offered to IPC. Moline had the opportunity to buy [Pro Corn], Jim Moline chose not to." Hansen then replied to Moline's email on June 8, 2006 stating:

> I am not aware of [Scoular IPC's] activity throughout the world or in Asia. Our intentions haven't waived since the day we agreed to work with you and part of me resents the tone in your e-mail. Rather than asking me our intentions, Jim I would ask what Delst Asia's sales plan and strategy is to combat it. In speaking with Henry, he indicated that he offered some product to you folks out of Preston to load in Wisconsin. You declined on the offer and he later got a bid from Scoular higher than he offered it to you and they booked it FOB Preston. You would have had a pricing advantage had you booked it. Preston doesn't have BPX yet, either, so it would be conventional Dakota Gold. We only guarantee that if they want to be sure it's Dakota Gold product they are getting they have to buy it from you.

> As for you statement of Scoular substituting BPX for Preston, I'm not sure I understand your statement. Preston will be moving towards BPX but they aren't a BPX plant today. As we have always stated, we give Midwest Ag proprietary treatment as our agreement indicates and that hasn't changed. Dr. Matt isn't supporting sales efforts with anyone buy your company.

> If you take a step back and review this, Jim, Midwest Ag [Enterprises] reduced the amount they wanted shipped by us over the past 90 days or so. We agreed to do that; John and I discussed this and our concerns. Volume is picking up again and we appreciate that. My lasting concern with our business relationship is that there are too many people in your process each taking a margin and I question how often that makes Delst non-competitive. We're working with you as our agreement states, as we always have. Jim, our relationship with you is so strong my team and I have already shared more information regarding trading than we would with anyone else.

> Jim, we value you as our customer and appreciate the business relationship

10

we have with you very much. I would suggest in the future on issues as sensitive as this that we visit verbally rather than using e-mail as the vehicle for communication.

On July 26, 2006, Moline sent a email to Henry Bender stating that he had met with a couple of customers and one had received 1000 tons of HP product from IPC/Scoular. Moline indicated that the product was off in color and low in fat and that they suspected it came from Glenville. Moline further indicated that two customers had received text messages with the US overnight on offers for Dakota Gold HP product. In his reply email, Henry Bender stated, "the HP is the odd looking Glenville material-nothing I would even consider showing to [Midwest Ag Enterprises] whom is known for high quality feed ingredients and our partner. I do not know if the HP came from Scoular or from a California source." Bender further stated, "[o]ur Dakota Gold shipments to Scoular have been very minimal. Jim you have seen every offer from Preston that we have had out there. We can ill afford not to sell Preston when you chose not to purchase the material." Moline replied to Harry Bender stating "[i]n regards to Preston, I have not been in a position to work that product as of yet. There has to have been other options besides throwing that product towards these other exporters. If they can get a little from your group they try to call it all Dakota Gold. Not a one of them has been loyal to your group as I have been. All they want to sell on is price, that's it!"

In July 2006, Moline was with Matt Gibson of Dakota Gold Marketing n/k/a Poet Nutrition in Japan during which time Gibson informed him that it was his view that Midwest Ag Enterprises did not have exclusivity over Dakota Gold products in the Pacific Rim. In August 9, 2006, Moline indicated in an email to Henry Bender that he "was quite bothered by that. Basically, it told me where DGM stands." During that trip, Moline and Matt Gibson met with Agrex/Mitsubishi, a customer of Midwest Ag Enterprises. Hansen had asked Moline to try broker a marketing agreement during his visit to Japan giving Agrex/Mitsubishi the exclusive rights to distribute Dakota Gold products in Japan. Apparently Moline and Mr. Gibson did not discuss a marketing agreement during their trip and on August 18, 2006, Hansen emailed Agrex/Mitsuibishi directly stating that it was his "desire to develop a marketing agreement with your company as our partner in the Japanese market and we would not sell knowingly to anyone else for our products being sold in Japan. In other words, Mitsubishi would be our exclusive marketer in Japan." Hansen indicated that he "would be

11

happy to fly to Japan to discuss this if needed" and to "[p]lease let me know your thoughts as we need to move forward in selecting our partner and we would like that to be your company."

## Repudiation by Midwest Ag Enterprises

On September 4, 2006, Moline sent an email to Henry Bender and Matt Gibson of Dakota Gold Marketing stating:

> I regret Matt, Henry to inform you that I will be notifying your whole group that I will no longer be exclusive to [Dakota Gold Marketing]. . . . I feel I have held up my end in this relationship and feel I haven't been treated in a like manner. Continued quality issues and a flawed marketing plan are my main reasons for this decision. My customers are asking for alternatives and I intend to give them options.

The next day, Moline informed Harry Bender that he had seen first hand BPX product on a truck that was being shipped into a container-loading facility in Minneapolis that did not belong to them and that IPC/Scoular had called Kansas City Transload about sending BPX cars into Kansas City. Moline was not sure, however, whether the product was ultimately going to Southeast Asia or to some other region not covered by the marketing agreement. Moline then stated in an email to Hansen on September 5, 2006, that "[t]his e-mail is intended to inform you of my decision to no longer handle Dakota Gold Products exclusively. There have been far to [sic] many issues to continue to do so. My customers have been asking me to look for an [sic] alternative suppliers in the marketplace and I intend to see what options are out there."

Although Moline had threatened to purchase product from other producers in his email, he did not do so until October 2007. Despite this fact, Moline admitted in his deposition testimony that he never informed Dakota Gold Marketing n/k/a Poet Nutrition of its intent to continue to abide by its obligation to exclusively distribute Dakota Gold products into the Territory. In fact, on October 2, 2006, Hansen, responding to certain concerns expressed by Moline, sent an email to Moline in which he acknowledged three times in the course of the email that Midwest Ag Enterprises no longer intended to represent Dakota Gold products exclusively in the Territory. Hansen also stated in that

email that Dakota Gold Marketing, Inc. n/k/a Poet Nutrition had information that KC Transload was distributing "sizeable tonnage" of DDGs from a company other than Dakota Gold Marketing, Inc. and that "[t]his raises concern about product identity preservation and adds to market confusion if Midwest Ag [Enterprises] is marketing multiple distillers' products." Moline admits in his deposition that he never did anything to let Defendants know that he was in fact still abiding by and intending to abide by the material terms of the Marketing Agreement.

**After Repudiation by Midwest Ag Enterprises**

After the repudiation by Midwest Ag Enterprises, the companies continued to do business much like they had done so before Moline sent the September 4, and September 5, 2006, emails. Hansen continued to press Moline to broker a marketing agreement with Agrex/Mitsubishi to represent Dakota Gold products in Japan and possibly China. On September 13, 2006, Hansen emailed his team at Dakota Gold Marketing n/k/a Poet Nutrition stating:

> We have to straddle the fence a little with regards to Jim [Moline] and Mitsubishi until on of them gives us clear direction on what they want to get done. If Jim can still help us solidify a marketing agreement with them we will keep him in the loop. On the other hand, if Shawn and Agrex choose to work direct with us and desire to pursue an agreement with us on their own we will do so. I have pressured Jim on getting a yes or no on the marketing agreement because we have to move forward in Japan and we're turning down opportunities each week.
>
> We have to keep in mind that Jim is still our customer, too, but we are moving away from him and branching out on our own. . . . .

In another email to Agrex Mitsubishi on September 15, 2006, Hansen stated:

> Shawn, I must admit that thing are becoming quite 'confused' from our perspective and we'd like to have your help in determining our future direction and to bring some clarity to the situation. . . .
>
> First and foremost, it is our desire to have Mitsubishi [sic] our exclusive marketer in Japan, at the minimum. What this means to us is that we would not sell Dakota Gold products to anyone in Japan other than Mitsubishi. We would provide

advertising support, point of sale support and nutritional support to you, your customers, and our products. . . . We are seeing tremendous interest from a variety of sources to ship our product into Japan but we have refused to sell the product until we receive an answer from Mitsubishi as to whether or not we can work together. We trust you a great deal and feel you're the type of partner we want to have.

Despite the fact that it appeared that Moline was going to continue to serve as the middleman between Dakota Gold Marketing n/k/a Poet Nutrition and Agrex/Mitsubishi, it appears that Dakota Gold Marketing began to quote directly to Agrex. Moline was made aware of this and on February 26, 2007, he emailed Henry Bender stating that he had been informed that Agrex had received a price from Dakota Gold Marketing on cars to the Pacific Northwest and that he was very disturbed they were quoted a price without his knowledge.

Additionally, it appears that AGP, a competitor of Midwest Ag Enterprises, began to handle the bulk shipments for Agrex/Mitsubishi at their request while Midwest Ag Enterprises continued to handle the container business. Moline was made aware of the fact that AGP had requested a bulk shipment price for Agrex. Henry Bender had called Moline prior to the sale informing him of such in order to give Moline an opportunity to make the sale to Agrex. Mr. Bender testified that Moline did not ask him not to make the sale, but was upset because AGP owned the facility at Greys Harbor and wanted to control it and Moline most likely knew that he was not going be to given a chance to transload out of that facility.

Moline told Hansen in an email on September 27, 2007, that he was aware of the direct sales by Dakota Gold Marketing n/k/a Poet Nutrition to AGP for export in the Pacific Rim and inquired about the intentions of Dakota Gold Marketing because Midwest Ag Enterprises had opportunities to work with other companies. Hansen informed Moline on October 15, 2007, that "Agrex did purchase about 50 cars from Henry for bulk shipment out of Grays Harbor and they wanted that ran through AGP. It was very awkward for us and I simply wanted Agrex to tell us how they want to do business in the future because I felt we were stuck in the middle and all we want to do is what the customer wants."

**Midwest Ag's Sales of DDGs by Companies Other than Dakota Gold Marketing n/k/a Poet Nutrition**

Midwest Ag's purchased 5,795 tons of DDGs from VeraSun from October 2007 through May 2008. The October 2007 shipment was delivered to Agrex in Japan, a region covered under the Marketing Agreement. On November 1, 2007, Midwest Ag Enterprises began purchasing DDGs from Renewable Resource Ag, LLC.

**Dissolution of Relationship Between Broin Enterprises and Midwest Ag Enterprises**

By March 26, 2008, Dakota Gold Marketing n/k/a Poet Nutrition and Agrex/Mitsubishi seemed to be moving toward doing business directly with one another and wanted to use Moline solely for logistics. This arrangement would result in both companies saving on commissions paid to Midwest Ag Enterprises. On April 3, 2008, Moline emailed Hansen bringing up for the first time that he believes the sales by Dakota Gold Marketing n/k/a Poet Nutrition to others were in breach of their Marketing Agreement which designated Midwest Ag Enterprises as the "proprietary customer/respresentative/distributor of Dakota Gold products in the Pacific Rim/S.E. Asia/and Japan." Additionally, Moline wanted to clarify that Agrex/Mitsubishi is a customer of Midwest Ag Enterprises. On April 18, 2008, Hansen discussed in an email to Moline how he interpreted the marketing agreement and stated that while he respected the fact that Agrex/Mitsubishi and Midwest Ag Enterprises had a close working relationship, "it was Agrex working through AGP who approached us for bulk vessel loadings from AGP's facilities in the [Pacific Northwest]. We did not make the initial contact and as a matter of fact, we asked if Midwest AG Enterprises should receive a brokerage fee or not. We make every effort to allow our customers to make their own choices rather than making them for them." Hansen then stated "we both need to make the choices that will be the best for our businesses and at this point it appears that notification of termination should be our next step but I await your response. I welcome your suggestions of how we can best work together in the future should that be an option."

On May 5, 2008, counsel for Midwest Ag Enterprises sent a letter stating that Dakota Gold

Marketing n/k/a Poet Nutrition must comply with certain enumerated demands within 15 days or face legal action. On May 7, 2008, counsel for Dakota Gold Marketing n/k/a Poet Nutrition sent a letter to Midwest Ag Enterprises giving formal notice of termination based on the September 2006 email from Moline saying that Midwest Ag Enterprises is no longer going to handle Dakota Gold exclusively and due to the fact that Midwest Ag Enterprises materially breached the Marketing Agreement by selling a competitor's DDGs in China. On May 18, 2008, Moline informed Agrex/Mitsubishi that:

> I find myself at the point of cutting all ties with Agrex/Mitsubishi. [Midwest Ag Enterprises] will finish out all contracted agreements we have with Agrex/Mitsubishi. When complete there will no longer be business contact in the present or in the future between [Midwest Ag Enterprises] and Agrex/Mitsubishi. When complete there will no longer be business contact in the present or in the future between [Midwest Ag Enterprises] and Agrex/Mitsubishi. . . .

Mr. Odano responded in an email to Moline that he "sincerely accept[s] your proposal to finish all relationship between you and mitsubishi except outstanding business." On May 19, 2008, Moline reaffirmed to Mr. Odano he was "discontinuing [his] relationship with you and your company," and that Mr. Odano "will be receiving a letter from [his] attorney in the next couple of days," and that "[t]here is a very good chance we will see you in a court of law."

On May 23, 2008, Dakota Gold Marketing n/k/a Poet Nutrition filed an action against Midwest Ag Enterprises and Jim Moline in state court seeking: (1) a declaratory judgment that is has not breached the marketing agreement and owes no further obligations to Midwest Ag Enterprises under the agreement (2) damages for breach of contract; (2) damages for tortious interference with business expectancy (3) damages for commercial disparagement. Midwest Ag Enterprises removed the action to federal court on June 20, 2008, and alleged the following counterclaims: (1) breach of contract, (2) breach of covenant of good faith and fair dealing, (3) fraud and deceit (4) tortious interference with business expectancies, (5) defamation, (6) punitive damages. In April 24, 2009, Midwest Ag Enterprises, Inc. and Midwest Ag Exports, Inc. filed a complaint against Poet Investments, Inc. f/n/a Broin Enterprises and Poet Nutrition, Inc., f/n/a Dakota Gold Marketing, Inc.

16

alleging the same causes of action as alleged in their counterclaims. The parties were realigned with the Midwest Ag Enterprises, Midwest Ag Exports and Jim Moline as plaintiffs and Poet Investments f/k/a Broin Enterprises and Poet Nutrition f/k/a Dakota Gold Marketing, Inc. as defendants.

On December 3, 2009, Plaintiffs filed an Amended Complaint in which they allege: (1) breach of contract, (2) breach of covenant of goof faith and fair dealing, (3) fraud and deceit, (4) tortious interference with business expectancies; (5) defamation, and (6) punitive damages. Plaintiffs have since withdrawn their defamation claim. The causes of actions stated in Defendants' complaint in the original action became counterclaims. The parties stipulated to the dismissal of all of Defendants' counterclaims but for Count 1 seeking a declaratory judgment to determine the parties' respective contractual rights. Additionally, Defendants stipulated to dismissing with prejudice their counterclaim against Jim Moline.

Defendants have moved for judgment on the pleadings on Plaintiffs' Count III alleging fraud and deceit and Count VI alleging punitive damages because they do not meet the pleading requirements of Federal Rules of Civil Procedure 9(b). Defendants have moved for summary judgment on all counts and claims alleged in Plaintiffs' Amended Complaint. Defendants ask the Court declare the legal interpretation of the Marketing Agreement in the event the Court does not grant complete summary judgment in favor of Defendants.

## LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement

to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations of its pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 257; *City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273-74 (8th Cir. 1988).

## DISCUSSION

Defendants have moved for summary judgment or in some instances, partial summary judgment on the following grounds: (1) Midwest Ag Exports has no rights under the Marketing Agreement; (2) Poet Nutrition is not bound by the Marketing Agreement; (3) lack of mutual assent; (4) the Marketing Agreement permitted Defendants to sell DDGs to other distributors who might export DDGS to the Territory; (5) Plaintiffs repudiated the Marketing Agreement, thereby terminating Defendants' obligations under the Agreement; (6) Plaintiffs materially breached the Marketing Agreement, thereby terminating Defendants' obligations under the Agreement; (7) Midwest Ag Enterprises can prove no or limited damages based on breach of Marketing Agreement; (8) Neither Midwest Ag Enterprises nor Midwest Ag Exports can prove damages without resorting to speculation; (9) Broin Enterprises n/k/a Poet Nutrition may not be held liable for any breaches occurring after December 31, 2006; (10) the Marketing Agreement was terminated by Defendants' formal notice of termination on May 7, 2008; (11) Plaintiffs cannot recover damages for any sales by Defendants to Agrex/Mitsubishi; (12) Plaintiffs' claim that Defendants breached certain contracts for the sale of DDGs are barred by arbitration and a one-year statute of limitations; (13) Plaintiffs have no claim for breach of the covenant of good faith and fair dealing; (15) Plaintiffs have failed to properly plead fraud and deceit and Defendants are also entitled to summary judgment on these causes of action; (16) Plaintiffs cannot prove their tortious interference claim; and (17) Plaintiffs have not properly pled and cannot prove punitive damages.

## I.

In the present case, Defendants allege that no valid contract was formed between the parties because there was no mutual assent regarding the rights granted Plaintiffs under the Marketing Agreement.

The Marketing Agreement is a valid contract between the parties to that contract. The contract is not ambiguous so extrinsic evidence will not be admitted to determined the meaning of the contract. The use of the word "proprietary" in the contract is not ambiguous. Merriam-Webster Online Dictionary defines the adjective "proprietary" to mean:

> 1: of, relating to, or characteristic of a proprietor <proprietary rights>"
> 2: used, made or marketed by one having the exclusive legal right <a proprietary process> <proprietary software>"
> 3: privately owned and managed and run as a profit-making organization <proprietary clinic>

Merriam-Webster Online, www.merriam-webster.com/dictionary/proprietary (following [2]proprietary (adjective)).

During the time the Marketing Agreement was in effect, Plaintiffs had the sole right to sell Dakota Gold in the Territory. Defendants also had the right to sell Dakota Gold to others so long as Defendants did not have notice or knowledge that the Dakota Gold buyer was a purchaser or reseller of Dakota Gold for the Territory. The jury as the trier of fact will have to determine in which instances Defendants sold Dakota Gold where Defendants had notice or knew that the Dakota Gold was going to the Territory. Damages to Plaintiffs resulting from such sales, if proven, are not speculative.

## II.

Defendants state as an affirmative defense that Midwest Ag Enterprises repudiated the Marketing Agreement multiple times, thereby terminating the obligations of both parties under the Agreement. Defendants point to an email Moline sent to Henry Bender and Matt Gibson of Dakota Gold Marketing, Inc., n/k/a Poet Nutrition on September 4, 2006 stating:

> I regret Matt, Henry to inform you that I will be notifying your whole group
> that I will no longer be exclusive to Dakota Gold Marketing. . . . I feel I have held
> up my end in this relationship and feel I haven't been treated in a like manner.
> Continued quality issues and a flawed marketing plan are my main reasons for this
> decision. My customers are asking for alternatives and I intend to give them options.

Defendants also cite an email that Moline sent to Hansen on September 6, 2006, stating that "[t]his email is intended to inform you of my decision to no longer handle Dakota Gold Products exclusively. There have been far too many issues to continue to do so. My customers have been asking me to look for alternative suppliers in the marketplace and I intend to see what options are out there."

When a party commits an anticipatory breach or repudiation of a contract by unequivocally indicating an intention not to perform when performance is due, the nonbreaching party may in turn treat the repudiation as an immediate breach of contract and sue for damages. *Weitzel v. Sioux Valley Heart Partners*, 714 N.W.2d 884, 894 (citing Restatement (Second) of Contracts § 236 cmt. a (1981)). The repudiation of a contract before the time for performance also relieves the other party from the obligation to offer to perform. *Union Pacific RR v. Certain Underwriters at Lloyd's London*, 771 N.W.2d 611, 622 (S.D. 2009) (quoting 13 Williston on Contracts 39:40 (4th ed. 2000) ("Before a repudiation by an obligor will relieve the obligee from performing conditions precedent to the obligor's performance, it must unequivocally indicate that the repudiating party intends not to honor his or her obligations under the contract.").

Plaintiffs contend that their conduct resulted in a retraction of the repudiations because they continued to do business with Defendants much as they had done so before the emails were sent by Moline. The Court was unable to find a case in which the South Dakota Supreme Court had occasion to examine a situation involving an alleged retraction of a repudiation. However, the Restatement (Second) of Contracts and Williston on Contracts, which the South Dakota Supreme Court has relied upon in its cases involving anticipatory repudiation, have stated that the repudiating party has the right and power to retract a repudiation as long as the other party has not substantially or materially changed his or her position in reliance upon the repudiation or indicated that he or she

considers the repudiation to be final. 15 Williston on Contracts 43:19; Restatement (Second) of Contracts § 256 (1981). A retraction may result from either words or conduct and any indication by the repudiator that he or she is once again willing and able to abide by the terms of the original contract. 15 Williston on Contracts 43:19; Restatement (Second) of Contracts 256, comment b (1981); *Liebowitz v. Elsevier Science Ltd.,* 927 F.Supp. 688, 701 (S.D.N.Y 1996) ("A repudiation which is followed by continued performance cannot be treated as an anticipatory breach, since continued performance amounts to a retraction of any repudiation.").

Plaintiffs cite no evidence in the record, other than the fact that the parties continued doing business after the repudiations by Midwest Ag Enterprises, to support its argument that Midwest Ag Enterprises retracted its repudiations of the Marketing Agreement. Although a retraction may result from conduct indicating that the repudiator is willing to abide by the terms of the original contract, the Court finds that Plaintiffs' continued performance under the contract does not give Defendants' notice of retraction. Plaintiffs could very well have continued doing business as usual with Defendants and could have also begun to conduct business with companies other than Defendants. Moline had ample time and opportunity to retract his repudiation of the Agreement, but did not do so. On October 2, 2006, Hansen, responding to certain concerns expressed by Moline, sent an email to Moline in which he acknowledged three times in the course of the email that Midwest Ag Enterprises no longer intended to represent Dakota Gold products exclusively in the Territory. Hansen also stated in that email that Dakota Gold Marketing, Inc. n/k/a Poet Nutrition had information that KC Transload was distributing "sizeable tonnage" of DDGs from a company other than Dakota Gold Marketing, Inc. and that "[t]his raises concern about product identity preservation and adds to market confusion if Midwest Ag [Enterprises] is marketing multiple distillers' products." Moline admits in his deposition that he never did anything to let Defendants know that he was in fact still abiding by and intending to abide by the material terms of the Marketing Agreement.

The September 4, and September 5, 2006, emails from Moline repudiated a material provision of the Marketing Agreement, thus relieving Defendants of their obligations under the Agreement. While Plaintiffs were permitted to retract such repudiation before Defendants materially

changed their position in reliance upon the repudiation or before Defendants indicated that they treated the reputation as final, Plaintiffs did not do so. There is no evidence in the record that Midwest Ag Enterprises retracted its repudiation prior to May 7, 2008, at which time Defendants indicated that they considered such repudiations to be final. Plaintiffs will not be permitted to recover damages for any breaches by Defendants beyond September 4, 2006.

## III.

In their Amended Complaint, Plaintiffs allege that Defendants breached various contracts for the shipment of dried distillers' grains. Plaintiffs allege that these contracts contained product and quality specifications for the Dakota Gold product to be shipped, and that Defendants failed to abide by these specifications. Plaintiffs also allege that Defendants breached these contracts when it failed to honor those contracts in a timely manner and when it required payment to be made in a shorter period than set forth in the parties' agreement. Defendants maintain that all of these claims are barred by arbitration and most are precluded by a one-year statute of limitations.

When product was purchased, the parties entered into a separate sales contract and Defendants would send a written Confirmation of Sale to Midwest Ag Enterprises by regular mail. The Confirmations of Sale contain a South Dakota choice of law provision and state that the "Buyer and Seller agree that all disputes and controversies between them under this agreement shall be settled by arbitration in accordance with the arbitration rules and regulations of the National Grain and Feed Association." The terms of the Confirmations of Sale also provide that any action on behalf of the buyer for breach of this contract must be commenced within one year after the cause of action accrued.

One-Year Statute of Limitations

Defendants have relied on an earlier version of SDCL § 57A-2-725(1)[2] and *Jandreau v.*

---

[2]The previous statutory language provided: "By the original agreement the parties may reduce the period of limitations to not less than one year ... ." The 1982 South Dakota Legislature

22

*Sheesley Plumbing & Heating Co.*, 324 N.W.2d 266 (S.D. 1982), in contending that that the parties could contractually limit the time to bring an action under their sales contracts. Defendants have also relied on the Official Comments to the current version of § 2-725(1) of the Uniform Commercial Code as support for their contention.

The current version of § 2-725(1) of the Uniform Commercial Code provides:

> (1) Except as otherwise provided in this section, an action for breach of any contract for sale must be commenced within the later of four years after the right of action has accrued under subsection (2) or (3) or one year after the breach was or should have been discovered, but no longer than five years after the right of action accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it. However, in a consumer contract, the period of limitation may not be reduced.

S.D.C.L. § 57A-2-725(1) currently and at all relevant times to this lawsuit has provided: "An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued." Although South Dakota has adopted the Uniform Commercial Code, S.D.C.L. § 57A-2-725(1) does not contain the provision in the corresponding Uniform Commercial Code allowing the parties to shorten the statute of limitations in their original agreement.

The Official Comments to the current version of § 2-725(1) of the Uniform Commercial Code is not of consequence in this scenario because the portion of § 2-725(1) in issue was not adopted by the South Dakota Legislature. Further, the failure to adopt the portion allowing the parties to shorten the statute of limitations is deemed intentional. *See* 2B NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 52:5 (6th ed. 2000) ("Ordinarily, when the legislature models a statute after a uniform act, but does not adopt the particular language, the court concludes that the omission was intentional and the policy of the uniform act was rejected."). In addition, the South Dakota Supreme Court has stated that "the law should set limitation periods, not private contracts." *Sheehan v. Morris Irrigation*, 410 N.W.2d 569, 570 (S.D.1987), *quoted in County of Pennington for Use and Benefit of Northwest Pipe Fittings*, 508 N.W.2d 376, 378 (S.D. 1993).

---

amended this provision.

23

Further, S.D.C.L. § 53-9-6 provides in relevant part that "[e]very provision in a contract restricting a party from enforcing his rights under it by usual legal proceedings in ordinary tribunals, or limiting his time to do so, is void." The one-year period of limitations in the Confirmations of Sale is not enforceable.

Arbitration

Defendants cite to 9 U.S.C. § 2[3] and S.D.C.L. § 21-25A-1[4] as support for the position that arbitration clauses are enforceable under federal and state law. Defendants further correctly maintain that the South Dakota Supreme Court has consistently favored and enforced arbitration clauses. *See Rossi Fine Jewelers, Inc. v. Gunderson*, 648 N.W.2d 812, 814 (S.D. 2002); *Thunderstik Lodge, Inc. v. Reuer*, 585 N.W.2d 819, 822 (S.D. 1998) ("We have consistently favored the resolution of disputes by arbitration."). Plaintiffs contend, however, that Defendant have waived their right to arbitration by substantially invoking the litigation machinery before asserting their arbitration right.

"It has been generally held or recognized that by such conduct as defending the action or proceeding with the trial, a defendant waives the right to arbitration of the dispute involved." *See*

---

[3] 9 U.S.C. § 2 provides:
> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

[4] S.D.C.L. § 21-25A-1 provides:
> A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

*generally*, Joel E. Smith, Annotation, *Defendant's Participation in Action as Waiver of Right to Arbitration of Dispute Involved Therein*, 98 A.L.R.3d 767 §2[a] (1980). The South Dakota Supreme Court has acknowledged that an arbitration agreement may be waived, but given the dominant policy favoring arbitration, such a waiver cannot be lightly inferred. *Rossi Fine Jewelers, Inc. v. Gunderson*, 648 N.W.2d at 814-15. The South Dakota Supreme Court set forth as follows the analysis for determining whether a waiver of arbitration has occurred:

> The question whether one has waived one's right to arbitrate turns on the significance of the action taken in a judicial forum; this question is one for a court to decide. Courts apply a two-part test for deciding whether arbitration has been waived. There must be (1) conduct or activity inconsistent with the right to arbitration and (2) prejudice to the party claiming waiver. Mere delay in seeking a stay of litigation without some resultant prejudice to a party cannot be deemed a waiver. However, delay and the extent of the moving party's trial-oriented activity are material factors in assessing a claim of prejudice. Prejudice may also result from lost evidence, duplication of efforts, or the use of discovery methods unavailable in arbitration.

*Id.* at 815 (internal citations omitted).

In *Tjeerdsma v. Global Steel Buildings, Inc.*, 466 N.W.2d 643, 645 (S.D.1991), the South Dakota Supreme Court held that sellers had waived their right to arbitration where they did not assert the right to arbitrate in their answer to the complaint or in their objection to the certificate of readiness.

In Plaintiffs' counterclaim, which was filed on June 27, 2008, Plaintiffs (who were then Defendants in this action) claimed breach of contract for breaches of the "Agreement and subsequent delivery contracts" for shipment of dried distillers grain. In their July 14, 2008 reply, Defendants (who were then Plaintiffs) set forth 13 paragraphs of defenses, but never alleged the existence of an arbitration clause. Defendants did not raise their arbitration claim until December 18, 2009, and took no steps to enforce the arbitration until they filed this Motion for Summary Judgment on February 2, 2010. Extensive discovery has been completed and this case is set for trial on July 19, 2010. Defendants maintain that most of the discovery that has been conducted was focused on the Marketing Agreement. Defendants also maintain that Plaintiffs were not specific in their allegations

regarding the other contracts for shipment of DDGs. Any lack of specificity regarding the allegations concerning the additional contracts for shipment of DDGs should not have prevented Defendants from timely raising their arbitration claim. In addition, although most of the discovery may have focused on the Marketing Agreement, there would no doubt be a duplication of discovery if the claims regarding the other contracts for shipment of DDGs were now required to be resolved in arbitration. Plaintiffs would then be prejudiced. Based on these considerations, the Court concludes that arbitration has been waived in this matter.

## IV.

The conduct with which Plaintiffs charge Defendants as having violated the implied covenant of good faith and fair dealing is the same conduct that forms the basis of Plaintiffs' breach of contract case based on the express terms of the Marketing Agreement. Under South Dakota law, "[i]f the express language of a contract addresses an issue, then there is no need to construe intent or supply implied terms." *Farm Credit Services of Am. v. Dougan,* 704 N.W.2d 24, 28 (S.D. 2005) (citation omitted); *see also Nygaard v. Sioux Valley Hospitals & Health Services,* 731 N.W.2d 184, 194 (S.D. 2007). In their brief in opposition to defendants' motion for summary judgment on the implied covenant of good faith and fair dealing claim, Plaintiffs write:

> Moline introduced Hansen to [Midwest Ag Enterprises'] customers in the Pacific Rim for the purpose of increasing [Midwest Ag Enterprises'] business and Defendants' business in the region. Moline worked tirelessly to build this market for both companies. Yet, in contravention of this common purpose, Defendants simply used Moline and [Midwest Ag Enterprises] to obtain the market for themselves. The implied covenant of good faith and fair dealing prohibits [Defendants] from depriving [Midwest Ag Enterprises] of its expected benefits from the Marketing Agreement. . . .

(Pls.' Br. In Opp'n to Defs.' Mot. for Summ. J. at 50.) The Court finds that the covenant that Plaintiffs' charge Defendants with having violated is expressed in the language of the contract appointing Midwest Ag Enterprises as the proprietary customer, representative and distributor of Dakota Gold products in the Territory. For these reasons, summary judgment is granted as to this

claim and Plaintiffs will not be able to present their implied covenant of good faith and fair dealing claim to the jury.

## VI.

Defendants have moved for summary judgment on Plaintiffs' claim of tortious interference with business expectancy. The tort of tortious interference with valid business relationship or expectancy has the following elements: (1) existence of valid business relationship or expectancy, (2) knowledge by interferer of relationship or expectancy, (3) intentional and unjustified act of interference on part of interferer, (4) proof that interference caused harm sustained, and (5) damage to party whose relationship or expectancy was disrupted. *Table Steaks v. First Premier Bank, N.A.,* 650 N.W.2d 829, 835 (S.D. 2002).

The Court concludes that Defendants are not entitled to summary judgment on the basis that Defendants' conduct does not constitute an intentional and unjustified act of interference with the business relationship between Midwest Ag Enterprises and Agrex/Mitsubishi. While Defendants state that its actions were confined to merely being present in a meeting room with representatives of Agrex and Midwest Ag Enterprises while Agrex proposed its idea to restructure the business relationship between the three parties, Plaintiffs point to emails and actions by Defendants that put in controversy the issue of Defendants' intent. Many of these acts by Defendants occurred prior to May 18, 2008, at which time Midwest Ag Enterprises informed Agrex/Mitsubishi that it was terminating their business relationship. When a party's intent is at issue, summary judgment must be granted with caution, since such issues of intent raise questions to be determined by the factfinder. *See Untied States v. One 1989 Jeep Wagoneer,* 976 F.2d 1172, 1176 (8th Cir. 1992). Plaintiffs have submitted evidence sufficient to survive a motion for summary judgment on their tortious interference with business expectancy claim.

## VII.

27

Defendants have moved to for judgment on the pleadings as to Plaintiffs' claim for fraud and deceit on the basis that Defendants have failed to plead these claims with the requisite particularity in violation of Federal Rules of Civil Procedure 9(b). Defendants have also moved for summary judgment on Plaintiffs' fraud and deceit claim.

Failure to Plead with Particularity

While Rule 9(b) must be applied in conjunction with the general pleading requirements of the Federal Rules, Rule 9(b) does require more specificity when pleading fraud than for pleading other causes of action. *Abels v. Farmers Commodities Co.*, 259 F.3d 910, 920 (8th Cir. 2001). Specifically Rule 9(b) provides that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b).

"To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *United States ex. rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006) (citations omitted). A defendant need not plead all of these factors to meet Rule 9(b) requirements, but must allege facts such that his pleadings are not merely conclusory. *Roberts v. Francis*, 128 F.3d 647, 651 n.5 (8th Cir. 1997). When determining whether a pleading is sufficient, a court must determine whether the complaint provides adequate notice to enable the adverse party to respond to the allegations of fraud or deceit brought forth by the plaintiff. *See Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 746 (8th Cir. 2002) ("Although a pleading alleging fraud need not provide anything more than notice of the claim, it must contain a higher degree of notice, enabling the defendant to respond specifically...to potentially damaging allegations of immoral and criminal conduct.").

Plaintiffs have met the pleading requirements imposed by Federal Rules of Civil Procedure

9(b) and Plaintiffs' claim for fraud and deceit will not be dismissed on that basis.

Merits of Fraud and Deceit Claim

Defendants also argue that Plaintiffs have failed to establish a claim for fraud and deceit.

In determining whether summary judgment on the issue of contractual fraud is appropriate, the court must look to the definitions of actual and constructive fraud set forth in SDCL ch. 53-4. *Brevet Int'l, Inc. v. Great Plains Luggage Co.,* 604 N.W.2d 268 (S.D. 2000) (citation omitted). SDCL 53-4-5 defines actual fraud as follows:

> Actual fraud in relation to contracts consists of any of the following acts committed by a party to the contract, or with his connivance, with intent to deceive another party thereto or to induce him to enter into the contract:
>
> (1) The suggestion as a fact of that which is not true by one who does not believe it to be true;
> (2) The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believe it to be true;
> (3) The suppression of that which is true by one having knowledge or belief of the fact;
> (4) A promise made without any intention of performing it; or
> (5) Any other act fitted to deceive.
>
> Actual fraud is always a question of fact.

SDCL 53-4-6 provides that constructive fraud consists:

> (1) In any breach of duty which, without any actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him, by misleading another to his prejudice or to the prejudice of anyone claiming under him; or
>
> (2) In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud.

Viewing the evidence in the light most favorable to Plaintiffs, the non-moving party, the

Court finds that questions of material fact exist as to whether Defendants ever intended to abide by the terms of the Marketing Agreement appointing Plaintiffs as the proprietary customer, representative, and distributor of Dakota Gold products in the Territory. Plaintiffs will be permitted to present their fraud and deceit claim to the jury.

## VIII.

To submit punitive damages to the jury there must be clear and convincing evidence that there is a reasonable basis to believe that the defendant was guilty of willful, wanton, or malicious conduct as required by SDCL § 21-1-4.1. *See Issac v. State Farm Mutual Auto. Inc. Co.,* 522 N.W.2d 782, 761 (S.D. 1994). This burden "is a preliminary, lower-order quantum of proof than must be established at trial." *Case v. Murdock,* 488 N.W.2d 885, 891 (S.D. 1992).

As stated by the Court during oral argument on the present motion, the Court finds that there has been enough of a showing with regard to punitive damages to permit Plaintiffs to present evidence to establish a claim for punitive damages. Plaintiffs will only be allowed to present their worth estimate, however, if the Court concludes that Plaintiffs have proved by a preponderance of evidence that they are entitled to punitive damages.

## IX.

All parties will remain in the case for trial. The changes of corporate structure and agency relationship will hopefully be more clear as the result of the test of a trial. In the meantime, none of the parties should be dismissed on the basis of the pre-trial arguments.

## X.

For the foregoing reasons, it is hereby ORDERED that Defendants' Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART and Defendant's Motion for Judgment

on the Pleadings is DENIED.

(1)    Damages based on Plaintiffs' breach of the Marketing Agreement claim will be limited in time by Plaintiff's repudiation on September 4, 2006, and will be limited to instances in which Defendants sold Dakota Gold to a purchaser or reseller where Defendants had notice or knew that the Dakota Gold was going to the Territory.

(2)    Summary Judgment is DENIED as it pertains to Plaintiffs' claims for breach of various contracts for the shipment of dried distillers' grains. Plaintiffs will be permitted to present these claims to the jury.

(3)    Summary Judgment is GRANTED on Plaintiffs' claim for breach of implied covenant of good faith and fair dealing and Plaintiffs will not be permitted to present this claim to the jury.

(4)    Summary Judgment is DENIED as to Plaintiff's claim for tortious interference with business expectancy and Plaintiffs will be permitted to present this claim to the jury.

(5)    Summary Judgment in DENIED as to Plaintiffs' claim for fraud and deceit. Plaintiffs will be able to present this claim to the jury.

(6)    Summary Judgment is DENIED as to Plaintiffs' claim for punitive damages. The Court will rule at trial on whether Plaintiffs have met their burden and may present their worth estimate to the jury.

(7)    All parties will remain in the case for trial. The changes of corporate structure and agency relationship will hopefully be more clear as the result of the test of a trial.

Dated this 9th day of June, 2010.

BY THE COURT:

_Lawrence L. Piersol_
Lawrence L. Piersol
United States District Court Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _Summa Unhof_
(SEAL)    DEPUTY